## DISTRIBUTION AGREEMENT

THIS DISTRIBUTION AGREEMENT ("Agreement") is made as of January 1, 2021 (the "Effective Date") by and between Permobil Americas operating in Canada as Permobil, Ltd., a corporation established and existing under the laws of the Ontario, having its principal place of business at 75 Mary Street, Unit 12, Aurora, Ontario, Canada L4G 163 ("Distributor") and Moxi Enterprises, LLC, a limited liability company established and existing under the laws of Florida, having its principal place of business at 4027 Tampa Road Ste. 3200, Oldsmar, FL 34677 ("Seller").

### RECITALS

A.   **WHEREAS,** Seller and its affiliates manufacture and supply therapeutic support surfaces.

B.   **WHEREAS,** Seller desires to increase the distribution and marketing of Seller's Products listed in Exhibit A (the "Products") in Canada (the "Territory").

C.   **WHEREAS,** Distributor desires to distribute the Products and possesses the necessary expertise and marketing and support organization to promote, market, distribute and support the Products.

D.   **WHEREAS,** Seller desires to appoint Distributor and Distributor desires to be appointed as the exclusive distributor of the Products in the Territory.

NOW THEREFORE, the parties agree as follows:

1. **APPOINTMENT AND SERVICES**

   1.1.   Scope. Seller hereby appoints Distributor as the exclusive distributor of the Products in the Territory to customers during the Term of this Agreement and subject to the terms and conditions hereof.

   1.2.   Reserved Rights. Except as otherwise set forth herein, no express or implied license or other rights of any kind are granted to Distributor regarding the Products and Distributor acknowledges that the Products and all right, title and interest therein, including but not limited to any copyright, patent, trade secret or other intellectual property right in and to the Products are the sole property of Seller and its suppliers, as applicable.

2. **GENERAL OBLIGATIONS OF DISTRIBUTOR**

   2.1.   Sales Requirement. Distributor shall use commercially reasonable efforts to further the promotion, marketing, sale, and distribution of the Products in the Territory.

   2.2.   Reporting. Upon request of Seller, Distributor shall provide Seller with reports of its activities and other information regarding the Products sales and market in the Territory.

   2.3.   Customer Service. Distributor shall provide customer service within the Territory, which shall include taking orders, responding to customer inquiries, fulfilling requests for quotes, forwarding Product and providing assistance or information that is reasonable to be successful with the Products in the Territory.

   2.4.   Pricing of Sales by Distributor. Distributor shall establish the prices for Products that Distributor resells to customer pursuant to this Agreement as Distributor deems fit in its sole discretion.

# EXHIBIT 1

3. **GENERAL OBLIGATIONS OF SELLER**

    3.1. <u>Distributor Training and Technical Support</u>. Seller shall make available to Distributor current technical information relating to the Products as reasonably necessary for Distributor's sale and service of the Products in the Territory. Seller shall make available to Distributor technical personnel necessary for training of Distributor's personnel in using, selling, repairing and servicing the Products.

    3.2. <u>Marketing Materials</u>. Unless otherwise agreed to between the Parties, Seller and Distributor shall work together to produce marketing materials that will be used in the Territory to market the Products.

    3.3. <u>Governmental Requirements</u>. Except as otherwise provided herein, Seller shall be responsible for compliance with all requirements established by governmental or regulatory authorities within the Territory, including but not limited to registration, certification and licensing requirements. In the event that any Product testing is required for compliance with requirements established by governmental or regulatory authorities within the Territory, Distributor shall notify Seller and (i) if available to Seller, Seller shall furnish the necessary testing information or (ii) Seller shall determine what is needed to satisfy such requirements.

    Pursuant to the ISO13485:2016 requirements that Seller is required to adhere to pursuant to Health Canada's Medical Device Regulations, Distributor agrees to abide by all Health Canada regulations applicable to the Products Distributor distributes for Seller, including those regulations related to record keeping, complaint handling, mandatory problem reporting, provision of information under Section 21.8 of the Act, and recall.

    3.4. <u>Audit Rights</u>. Seller shall keep full, true and accurate records, in accordance with generally accepted accounting practices reflecting the products delivered, services performed and any expenses incurred for which Seller seeks reimbursement under any purchase order. These records, unless prohibited by applicable law, shall be made available for auditing on behalf of Distributor upon five (5) business days' prior written notice. Distributor shall be entitled to enter Seller's premises or other facilities where the Products are being manufactured, stored or handled upon reasonable notice and during normal working hours, to audit and inspect that Seller is complying with the terms of any purchase order, including amongst others the quality of the design, manufacturing, testing, handling or storage of the Products. Seller undertakes to assist in such audit and inspection to the extent required by Distributor

4. **SALES OF PRODUCTS AND SERVICES**

    4.1. <u>Purchase Orders and Delivery</u>. All order(s) placed with Seller by Distributor will be delivered by Seller to Distributor pursuant to the terms hereof. For all orders of Standard products in quantities of 20 or less, Seller shall use its best efforts to ensure the Products are ready to be picked up within seven (7) days of the date of receipt of a purchase order from Distributor.

    4.2. <u>Modification of Orders</u>. Distributor may modify, cancel, or reschedule an accepted Purchase Order in whole or in part without liability to Seller by notifying Seller no later than ten (10) business days prior to the original delivery date outlined in the purchase order. However, if Seller has begun production on a custom order, Distributor may not cancel the Purchase Order. In case of any conflict, unless the context clearly indicates otherwise, this main document shall have precedence over any purchase order.

    4.3. <u>Title</u>. Title to each Product shall transfer upon the later of (a) delivery of such Product to Distributor as specified or (b) receipt by Seller of payment in full for such Product.

4.4. <u>Acceptance of Products</u>. In the event of any shortage, damage or discrepancy in or to a shipment of Products, Distributor shall promptly report the same to Seller and furnish such written evidence or other documentation. Seller shall promptly deliver additional or substitute Products to Distributor and shall be responsible for any additional shipping costs associated with such delivery.

4.5. <u>Buffer Stock</u>. Seller shall maintain buffer stock of each Product equal to three months' forecasted demand for that Product.

4.6. <u>Product Changes</u>. The parties may during the term of the Agreement add or remove Products to Exhibit A by written agreement. Seller may not do any of the following without reasonable notice to Distributor and providing Distributor the option to do a "last time buy" of the Product in question:

(a) Alter the specifications for any Product or any new release thereof;

(b) Discontinue the development of any new release of a Product, whether or not such new release has been announced publicly and discontinue the sale of any Product; and

(c) Commence the development and distribution of a new release of a Product having features which may make any Product wholly or partially obsolete, whether or not Distributor is granted any distribution rights in respect of such new products.

4.7. <u>Replacement and Spare Parts</u>. Seller shall make replacement parts available to Distributor in accordance with Seller's then-current replacement parts price list. Seller shall carry replacement parts for all then-current Products, and shall make reasonable efforts to carry replacement parts for past Products discontinued in the prior two years.

4.8. <u>Product Packing, Labeling, and Documentation</u>. Seller shall provide Distributor with packaging, user manuals, instructions, safety information sheets and other documentation relating to the Products, including language or wordings required or advisable to be used for the distribution and sale of such Products in the Territory.

4.9. <u>Translations</u>. If any national or regional authority within the Territory requires a written translation of the documentation to be included with any Products sold within the Territory ("Translation Requirement"), Seller shall provide Distributor with such documentation translated into the language required by the applicable regional or national authority within the Territory, and Distributor shall be responsible for providing and including printed copies of the translated documentation for any and all affected Products sold in the Territory.

5. **PRICE AND PAYMENT TERMS**

5.1. <u>Products Prices</u>. From the Effective Date through June 30, 2021, Distributor shall continue paying Seller pursuant to the current Price List between the Parties. Effective July 1, 2021, Distributor shall pay Seller for Products in accordance with the Price List and discount schedule set forth in Exhibit A attached hereto. Seller may only change the Price List in Exhibit A upon providing ninety (90) days prior written notice to Distributor.

5.2. <u>Payment Terms</u>. All payments by Distributor are due within thirty (30) days from the date of invoice, unless otherwise agreed in writing by the parties.

5.3.  Currency. All payments by Distributor to Seller hereunder shall be made in USD, unless otherwise specified in writing.

## 6. TERM AND TERMINATION

6.1.  Term. The initial term of this Agreement shall begin on the Effective Date and shall end on December 31, 2022 ("Term"), unless the parties agree in writing to extend the Agreement for an additional twelve (12) month term or the Agreement is terminated earlier as provided herein. The parties shall meet no later than September 30, 2022 to determine whether to extend this Agreement.

6.2.  Termination.

(a)  This Agreement may be terminated by mutual agreement of the parties, and without prejudice to any other available remedies. Either party shall have the right to terminate this Agreement immediately, at any time, by giving written notice to the other party, in any of the following events:

  (i)  if the other party commits a material breach of any term or condition of this Agreement and fails to cure such breach within thirty (30) days after written notice thereof; or

  (ii)  if the other party becomes insolvent, makes a general assignment for the benefit of creditors, suffers or permits an appointment of a receiver for its business or assets, becomes subject to any proceedings under any bankruptcy or insolvency law, whether domestic or foreign, or is liquidated, voluntarily or otherwise.

(b)  Distributor may terminate this Agreement for convenience, at will and without cause, upon not less than ninety (90) days of written notice to Seller.

6.3.  Rights Upon Termination. Upon termination or expiration of this Agreement each party shall promptly return or destroy all documents and tangible materials (and any copies) containing, reflecting, incorporating, or based on the other party's Confidential Information.

6.4.  Post-Term Resale. On the expiration or earlier termination of this Agreement, Distributor may, in accordance with the applicable terms and conditions of this Agreement, sell off its existing inventories of Product for a period of six (6) months following the last day of the Term.

6.5.  Spare Parts Upon Termination. Seller agrees to maintain capabilities necessary to provide after sales spare parts and technical and service support to Distributor or its designated third party in relation to any Products for a minimum of seven (7) years from the date of final shipment of a particular Product to Distributor. The purchase price for such parts shall be identical to the purchase price for the Product pursuant to this Agreement.

## 7. SELLER WARRANTY AND INDEMNITY

7.1.  Compliance with Laws. Seller is in compliance with and shall comply with all applicable laws, regulations, and ordinances. Seller has and shall maintain in effect all the licenses, permissions, authorizations, consents, and permits that it needs to carry out its obligations under this Agreement.

7.2.  Warranties. Seller warrants to Distributor that for the lengths of time outlined in Exhibit B, Products will: (a) be free from any defects in workmanship, material, and design; (b) conform to applicable specifications and other requirements specified by Distributor; (c) be fit for their intended purpose and

operate as intended; (d) be merchantable; (e) be free and clear of all liens, security interests, or other encumbrances; and (f) not infringe or misappropriate any third party's patent or other intellectual property rights. These warranties survive any delivery, inspection, acceptance, or payment of or for the Products by Distributor. These warranties are cumulative and in addition to any other warranty provided by law or equity. Any applicable statute of limitations runs from the date of Distributor's discovery of the noncompliance of the Products with the foregoing warranties.

7.3. General Indemnification. Seller shall indemnify, defend, and hold harmless Distributor, its officers, directors, employees, agents, affiliates, successors and permitted assigns (collectively, "Indemnified Party") against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees, fees, and the costs of enforcing any right to indemnification under this Agreement and the cost of pursuing any insurance providers, incurred by Indemnified Party (collectively, "Losses"), relating to any claim of a third party or Distributor arising out of or occurring in connection with the Products purchased from Seller or Seller's negligence, willful misconduct, or breach of this Agreement.

7.4. Intellectual Property Indemnification. Seller shall indemnify, defend, and hold Indemnified Party harmless against any and all Losses arising out of or in connection with any claim that Indemnified Party's use or possession of the Products infringes or misappropriates the patent, copyright, trade secret, or other intellectual property right of any third party. In no event shall Seller enter into any settlement without Distributor's prior written consent.

8. **QUALITY ASSURANCE**

8.1. Quality Requirements and Testing. Seller shall implement and maintain adequate quality systems and documented procedures which identify, control and segregate non-conforming Products. Where any monitoring or measurement equipment is used in Seller's development, manufacturing, logistics or other operational environment, such equipment shall be calibrated adequately.

Seller shall ensure the availability of all certificates of conformity and related documentation issued by original equipment Sellers for all components of the Products and shall, upon request, provide Distributor with a copy thereof. Seller shall implement and maintain a method of traceability ensuring tracking of the supply chain to every original equipment Seller, authorised distributor and aftermarket Seller for each Product and every component. In connection with each release of a Product pursuant to modified Specifications and upon request of Distributor from time to time, Seller shall accompany the delivery of a Product with certificates of conformity consistent with Distributor's instructions in relation thereto from time to time.

9. **INSURANCE**

9.1. Commercial General Liability Insurance. Seller shall, at its own expense, maintain, and carry insurance in full force and effect that includes, but is not limited to, commercial general liability (including product liability) with limits no less than $1,000,000.00 for each occurrence and $2,000,000 in the aggregate.

9.2. Certificate of Insurance. Seller shall provide Distributor with a certificate of insurance and policy endorsements for all insurance coverage required by this Section, and shall not do anything to invalidate such insurance. The certificate of insurance shall name Distributor as an additional insured.

## 10. LIMITATION OF LIABILITY

EXCEPT FOR LIABILITY FOR INDEMNIFICATION OR LIABILITY FOR INFRINGEMENT OR MISAPPROPRIATION OF INTELLECTUAL PROPERTY RIGHTS, DISTRIBUTOR IS NOT LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, OR ENHANCED DAMAGES, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS AGREEMENT, WHETHER OR NOT THE POSSIBILITY OF SUCH DAMAGES HAD BEEN DISCLOSED IN ADVANCE BY SELL OR WAS FORESEEABLE, REGARDLESS OF THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT OR OTHERWISE) UPON WHICH THE CLAIM IS BASED, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE.

## 11. CONFIDENTIALITY

11.1. *Confidential Information*. From time to time during the Term, either party may disclose or make available to the other party information about its business affairs, products, confidential intellectual property, trade secrets, third party confidential information, and other sensitive or proprietary information (collectively, "Confidential Information"). Confidential Information shall not include information that, at the time of disclosure is: (a) in the public domain; (b) known to the receiving party at the time of disclosure; or (c) rightfully obtained by receiving party on a non-confidential basis from a third party.

The receiving party shall not disclose any such Confidential Information to any person or entity, except to the receiving party's employees who have a need to know the Confidential Information for the receiving party to perform its obligations hereunder. On the expiration or termination of the Agreement, the receiving party shall promptly return to the disclosing party all copies, whether in written, electronic, or other form or media, of the disclosing party's Confidential Information, or destroy all such copies and certify in writing to the disclosing party that such Confidential Information has been destroyed.

## 12. TRADEMARKS

12.1. *Use of Trademarks*. Seller hereby grants to Distributor, and Distributor hereby accepts from Seller, a nonexclusive, nontransferable and royalty-free license to use the Seller and the Seller's affiliates' trademarks specified in writing by Seller, solely in connection with the distribution, promotion, advertising and support and maintenance of the Products and in accordance with Seller's standards and instructions. Distributor shall be allowed to use Seller's trademarks in conjunction with Distributor's trademarks when marketing the Products. Distributor is not granted any right, title or interest in such trademarks other than the foregoing limited license, and Distributor shall not use any Seller trademarks as part of Distributor's corporate or trade name or permit any third party to do so.

12.2. *Infringement*. Distributor shall promptly notify Seller in writing of any unauthorized use of Seller's trademarks or similar marks which may constitute an infringement or passing off of Seller's trademarks. Seller reserves the right in its sole discretion to institute any proceedings against such third party infringers. Distributor shall cooperate fully with Seller in any legal action taken by Seller against such third parties, provided that Seller shall pay all expenses of such action and all damages which may be awarded or agreed upon in settlement of such action shall accrue to Seller.

## 13. MISCELLANEOUS

13.1. *Independent Contractors*. Notwithstanding anything else set forth herein to the contrary, the relationship of the parties is that of independent contractors, and nothing herein shall be construed to create a partnership, joint venture, franchise, employment, or agency relationship between the parties.

Distributor shall have no authority to enter into agreements of any kind on behalf of Seller and shall not have the power or authority to bind or obligate Seller in any manner to any third party.

13.2. Notices. All notices, requests, demands, claims and communications shall only be deemed to be properly given: (a) upon tender, if personally given; (b) if delivered by electronic means or facsimile transmission with confirmation of receipt, on the first business day after being sent; (c) if sent by registered or certified mail, on the date of the actual receipt; and (d) if sent by regular mail, seven days after mailing.

If it is to Distributor, it shall be addressed to:

> Permobil, Inc.
> Office of the General Counsel
> 300 Duke Dr.
> Lebanon, Tennessee, U.S. 37090
> E-mail address: legal@permobil.com

If it is to the Seller, it shall be addressed to:

> Rick Sorrento
> Moxi Enterprises, LLC
> 4027 Tampa Rd., Ste. 3200
> Oldsmar, FL 34677
> 4027
> E-mail address: rick@moxiusa.com

Or, to any other address, or addressee, that may be designated by the respective parties, in writing, from time to time, pursuant to this paragraph.

13.3. Governing Law. This Agreement has been made, executed and delivered in the Province of Ontario, in which Province the principal office of Distributor is located. Accordingly, the parties invoke the laws of the Province of Ontario, Canada regarding the protection of their rights and enforcement of their obligations hereunder and they mutually stipulate and agree that this Agreement is in all respects (including but not limited to all matters of interpretation, validity, performance and the consequences of breach) to be exclusively construed, governed and enforced in accordance with the internal laws (excluding all conflict of laws rules) of the Province of Ontario, Canada and any applicable laws of Canada, as from time to time amended and in effect.

13.4. Entire Agreement. This Agreement, including the Exhibits attached hereto, which are hereby incorporated by reference, constitutes the entire agreement between the parties concerning the subject matter hereof, and supersedes and replaces all prior or contemporaneous understandings or agreements, written or oral, regarding such subject matter. No amendment to or modification of this Agreement, or any waiver of any term or condition of this Agreement will be binding unless in writing and signed by a duly authorized representative of each party. The section and subsection headings in this Agreement are inserted solely as a matter of convenience and for reference, and shall not be considered in the construction or interpretation of any provision hereof.

13.5. Force Majeure. Any delay or failure of either party to perform its obligations under this Agreement will be excused to the extent that the delay or failure was caused directly by an event beyond such party's reasonable control, without such party's fault or negligence and that by its nature could not have been foreseen by such party or, if it could have been foreseen, was unavoidable (which events may include natural disasters, embargoes, explosions, riots, wars or acts of terrorism) (each, a "Force Majeure

Event"). Changes in cost or availability of materials, components or services, market conditions, or supplier actions or contract disputes will not excuse performance by Seller. A party shall give the other party prompt written notice of any event or circumstance that is reasonably likely to result in a Force Majeure Event, and the anticipated duration of such Force Majeure Event. An affected party shall use all diligent efforts to end the Force Majeure Event, ensure that the effects of any Force Majeure Event are minimized, and resume full performance under this Agreement.

13.6. <u>Language</u>. The official language of this Agreement is English. All contract interpretations, notices and dispute resolutions shall be in English. Any amendments to this Agreement shall be in English. Translations of any of these documents shall not be construed as official or original versions of the documents, or otherwise referred to in the interpretation or construction of the intentions of the parties hereto. *Les signataires confirment leur volonté que la présente convention, de même que tous les documents s'y rattachant, y compris tout avis, annexe et autorisation, soient rédigés en anglais seulement.*

13.7. <u>Execution</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original hereunder.

13.8. <u>Severability</u>. If any provisions or portion of this Agreement shall be held to be illegal, invalid or unenforceable or such provision would violate applicable laws or regulations in the Territory, such invalidity or unenforceability shall not invalidate or render unenforceable the entirety of this Agreement. Unless a failure of consideration would result, any such provision will be deemed revised to the minimum extent necessary in order to make this Agreement valid and enforceable and/or able to be complied with within the Territory, provided the Agreement as revised shall continue to reflect the parties' original intent as nearly as possible.

15.11. <u>No Waiver</u>. Any waiver authorized on one occasion is effective only in that instance and only for the purpose stated, and does not operate as a waiver on any future occasion. No failure or delay in exercising any right, remedy, power, or privilege or in enforcing any condition under this Agreement or any act, omission, or course of dealing between the parties constitutes a waiver or estoppel of any right, remedy, power, privilege, or condition arising from this Agreement.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date first set forth above.

**Moxi Enterprises**

By: _____
Name: Kevin Farrell
Title: COO

**Permobil Americas**

By: _____
Name: _____
Title: _____



**EXHIBIT A**

**Permobil Canada**

**Pricing**

| Moxi Item # | Description | Old Contract Price | New Schedule A Price | Proposed Increase |
|---|---|---|---|---|
| SAMAXSYSK004120 | SelectAir Max system footed with 2 piece cover | $ 1,219.00 | $ 1,219.00 | 0% |
| SAMAXSYSK010120 | SelectAir Max system non-footed with one piece cover | $ 1,219.00 | $ 1,219.00 | 0% |
| SABARISYS39120 | BariSelect system 39" footed with 2 piece cover | $ 1,609.00 | $ 1,609.00 | 0% |
| SABARISYS42120 | BariSelect system 42" footed with 2 piece cover | $ 1,609.00 | $ 1,609.00 | 0% |
| SABARISYS48120 | BariSelect system 48" footed with 2 piece cover | $ 1,729.00 | $ 1,729.00 | 0% |
| SABARISYS54120 | BariSelect system 54" footed with 2 piece cover | $ 2,109.00 | $ 2,109.00 | 0% |
| SABARISYS60120 | BariSelect system 60" footed with 2 piece cover | $ 2,109.00 | $ 2,109.00 | 0% |
| SAHYOVMATTSYS120 | HybridSelect overlay system with cushion | $ 1,179.00 | $ 1,179.00 | 0% |
| FIRSTCSYS | FirstCare overlay system | $ 1,025.00 | $ 1,025.00 | 0% |
| SAMAXSYSCUST* | SelectAir Max w/39" mattress, cover, pad | $ 1,439.00 | $ 1,439.00 | 0% |
| SAMAXSYSCUST* | SelectAir Max w/42" mattress, cover, pad | $ 1,439.00 | $ 1,439.00 | 0% |
| SAMAXSYSCUST* | SelectAir Max w/48" mattress, cover, pad | $ 1,559.00 | $ 1,559.00 | 0% |
| SAMAXSYSCUST* | SelectAir Max w/54" or 60" mattress, cover, pad | $ 1,779.00 | $ 1,779.00 | 0% |
| FUSAPT80 | Fusion APT 80" (FC-MOX1007, PM-MOX0050) | $ 693.00 | $ 693.00 | 0% |
| EMOTION | Emotion 80" (FC-MOX1006, FM-MOX1006) | $ 793.00 | $ 793.00 | 0% |
| FUS2K80CA | Fusion 2K system 35 x 80" | $ 1,289.00 | $ 1,314.78 | 2% |
| FUS2K84CA | Fusion 2K system 35 x 84" | $ 1,289.00 | $ 1,314.78 | 2% |
| FUS2KXL4280CA | Fusion 2K system 42 x 80" | $ 1,489.00 | $ 1,518.78 | 2% |
| FUS2KXL4880CA | Fusion 2K system 48 x 80" | $ 1,689.00 | $ 1,722.78 | 2% |
| FUSXC80 | Fusion XC system 35 x 80" | $ 393.00 | $ 400.86 | 2% |
| FUSXC3980* | Fusion XC system 39 x 80" | $ 695.00 | $ 708.90 | 2% |
| FUSXC4280* | Fusion XC system 42 x 80" | $ 695.00 | $ 708.90 | 2% |
| FUSXC4880* | Fusion XC system 48 x 80" | $ 725.00 | $ 739.50 | 2% |
| FUSXC5480* | Fusion XC system 54 x 80" | $ 745.00 | $ 759.90 | 2% |
| FUSXC80VIS1* | Fusion XC system 35 x 80" w/Visco heel & 1" Visco top | $ 411.00 | $ 423.33 | 3% |
| FUSXC80VIS1-4H* | Fusion XC system 35 x 80", sloped with handles | $ 447.80 | $ 461.23 | 3% |
| FUSXC80VIS1-4HNS* | Fusion XC system 35 x 80", no slope with handles | $ 472.80 | $ 486.98 | 3% |
| HYFOAMBASE* | Hybrid foam base 3" | $ 162.00 | $ 165.24 | 2% |
| FUSXC3580VIS* | Fusion XC system 35 x 80" w/Visco heel section | $ 361.00 | $ 368.22 | 2% |
| FUSXC3980VIS* | Fusion XC system 39 x 80" w/Visco heel section | $ 775.00 | $ 790.50 | 2% |
| FUSXC4280VIS* | Fusion XC system 42 x 80" w/Visco heel section | $ 775.00 | $ 790.50 | 2% |
| FUSXC4880VIS* | Fusion XC system 48 x 80" w/Visco heel section | $ 805.00 | $ 821.10 | 2% |

*CUSTOM, NON-RETURNABLE ITEM. ORDER CANNOT BE CANCELLED.

**EXHIBIT B**

**Warranty**